**STATE of Missouri, Respondent,**

v.

**Joseph Arthur BOYER, Jr., Appellant.**

**No. 56403.**

Supreme Court of Missouri,
Division No. 1.

Feb. 22, 1972.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Benson Cytron, House Springs, for appellant.

HIGGINS, Commissioner.

Joseph Arthur Boyer, Jr., was convicted by a jury of murder, first degree. The jury failed to agree on punishment, and the court assessed punishment at life imprisonment. Sentence and judgment were rendered accordingly. §§ 559.010, 559.030, V.A.M.S.; Criminal Rule 27.03, V.A.M.R.

Joseph Arthur Boyer was charged by information with the deliberate and premeditated murder of Larry James Smith by shooting him with a 22-caliber Sears rifle in Jefferson County, Missouri, September 17, 1969.

On September 17, 1969, Ray Starr was the owner of a Standard service station at the intersection of I–55 and Z Highways near Pevely, Jefferson County, Missouri. In early 1969 the defendant worked for him for about two weeks. Larry James Smith began working for Mr. Starr August 22, 1969, and was on duty at the station the night of September 16 and early morning of September 17, 1969.

James C. Chambers, an employee of the Jefferson County sheriff's office, received a radio call at 3:35 a. m., September 17, 1969, and proceeded to Mr. Starr's station, arriving there at 3:41 a. m. He found the body of a man later identified as Larry James Smith lying in the driveway of the station. He went into the station and found a cash register open with the metal insert on the floor twelve feet away. He also found two spent 22-caliber cartridge cases on the floor and two more such empty shells in the back part of the garage. He gave these items to Officer Ferguson upon his later arrival at the scene. Later, he went to the Politte Funeral Home where an autopsy was performed on Larry James Smith. He saw a bullet taken from the body which was given to him and which he, in turn, gave to Officer Ferguson.

Irvin Ferguson, also an employee of the Jefferson County sheriff, went to Mr. Starr's station after receiving a call at 3:40 a. m., September 17, 1969, and met Officer Chambers from whom he received the four 22-caliber casings. Officer Ferguson also went to the Politte Funeral Home where he observed the autopsy performed by Dr. Sheffield. Dr. Sheffield removed some lead fragments from the victim's body. Later on, he received a 22-caliber rifle from Deputy Sheriff Ted Wheelis which, together with the four shell casings and the lead fragments, he delivered to Detective Reeder in the St. Louis police laboratory.

James C. Rehn, Jefferson County coroner, examined the body of Larry James Smith at 4:45 a. m., September 17, 1969. He noted the only injury to be a small caliber bullet wound in the left lower section of the abdomen.

Dr. William H. Sheffield, a pathologist, performed the autopsy on the body of Larry James Smith. He found no external trauma except for a wound in the lower abdomen just below the belt line on the left side. He determined it to be a gunshot wound and the bullet wound was the cause of death. He found an extensively distorted bullet imbedded in the right iliac bone which he removed and gave to Deputy Ferguson.

Robert Finder, father-in-law of defendant, saw him two days prior to September 17, 1969, at which time he saw a 22-caliber rifle on the back seat of his 1960 or 1961 red convertible Ford automobile.

On September 17, 1969, Leo Ray Link was in charge of security at Pittsburgh Plate Glass Company in Crystal City, Missouri. At 1:00 a. m., he was called by a guard who had seen a car go into the parking lot. He drove to the lot and waited for about five minutes when he saw a red and white, 1959 Chevrolet belonging to

Willis Skaggs leave the lot. He determined that Mr. Skaggs was working and that someone else had taken his car. They went to the police station and reported the theft. Mr. Link saw the Chevrolet later at 3:00 a. m., parked in another part of the Pittsburgh Plate Glass parking lot. He returned to the police station to report this information which was then put on the police radio. He returned to the parking lot and saw Officer Nahlik with defendant in his patrol car. He noted the defendant had black markings under his eyes.

Joe Harmon, an employee at Pittsburgh Plate Glass, was on relief between 3:00 and 3:30 a. m., September 17, 1969, when he saw Mr. Skaggs's Chevrolet drive into the parking lot.

Willis Skaggs was told by Mr. Link of the theft of his car between 1:30 and 2:00 a. m., September 17, 1969. He went with Mr. Link to the police station to report the loss. He next saw the car between 3:00 and 3:30 a. m. when it pulled into the parking lot. He next saw Officer Nahlik with someone who got out of his car. He permitted Officer Nahlik to take the car to the police station and he obtained it next day. In order to start it, he had to "wire it up" as shown by the police.

Robert E. Nahlik, assistant chief of police in Crystal City, was first advised to look for a white-over-red 1959 Chevrolet at 2:05 a. m., September 17, 1969. He first saw it in the west parking lot at Pittsburgh Plate Glass around 3:30 a. m. He went up to it and found defendant lying down in the front seat. He arrested defendant and noted a butcher knife, pillowcase, hand towel, washcloth, some rolled money in a box, and a can of Goop hand cleaner in the car. He placed defendant in a patrol car with Sergeant Haverstick, walked around the car, looked through the window and saw a 22-caliber rifle. He obtained permission from Mr. Skaggs to take the car to the police station to search it. Given permission, he took the car to the station after first rewiring the ignition. The wires had been pulled loose.

Theodore L. Wheelis, another employee of the Jefferson County sheriff, participated in the search of the Skaggs automobile at a garage near the Crystal City police station. He took from it a 22-caliber rifle, towel, washcloth, Goop, and $54 in bills and $75 in change. He also removed twelve 22-caliber shells from the rifle. He gave the rifle and shells to Officer Ferguson.

Paul Reeder of the St. Louis police department laboratory, received the rifle, shells, casings, and bullet from Officer Ferguson. The bullet fragment was too deformed to compare with a bullet test fired from the rifle but it and the rifle did compare with respect to number of lands and grooves and direction of twist. The four spent shells all had markings identical to a test-fired shell. His opinion was that the four shells (found in the station) were fired by the rifle (found in the car with defendant).

A written, signed confession of defendant recited that he left his home in Crystal City about 1:15 a. m., September 17, 1969, and went to the Pittsburgh Plate Glass parking lot where he "hot wired" a 1959 Chevrolet. He drove to the vicinity of the Standard service station at I–55 and Z, parked and watched until things "quieted down." He loaded his 22-caliber Sears rifle with 15 shells, drove to the station, and got out with the rifle. He pointed the rifle at the attendant and told him it was a stickup. He fired two or three shots to scare him, and forced him into the rear of the station. He fired two or three more shots, and then yet another which hit him in the side. He fell to the floor and groaned. Defendant then went to the cash register and took everything from it. He drove back to Crystal City but could not get onto the main parking lot, so he parked elsewhere.

Defendant's position, as adduced through his testimony and that of his wife, druggist, and doctor, was that he had suffered from kidney trouble for some time prior to September 17, 1969, for which he took cer-

tain medicines including Demerol, a type of narcotic substance. On the night in question, he took two pills about 6:30 p. m. and "some more" around 10:00 p. m. He did not remember leaving the house, and had "just very little" knowledge of what transpired with respect to the Pevely service station and the death of Larry James Smith. In answer to a hypothetical question, based on the assumed quantity of the drug taken, the doctor was of the opinion that the defendant was not thereafter in total possession of all his faculties.

Appellant concedes there is no question of sufficiency of evidence to support the verdict, and the foregoing statement demonstrates a submissible case of murder, first degree, under the felony-murder doctrine. § 559.010, supra.

Appellant confines his appeal to a single contention that the court erred "in not sustaining defendant's motion to exclude all evidence and reference to a car theft which was unrelated to the crime with which defendant was charged and highly prejudicial to the defendant and allowing such evidence to be adduced by the State."

■ Appellant would bring himself within the protection of the general rule that proof of the commission of separate and distinct crimes is not admissible, unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial; and that if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected. See State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307, which speaks further generally that evidence of other crimes is competent in proof of the charged crime when it tends to prove motive, intent, absence of mistake or accident, common scheme or plan embracing two or more related crimes, identity. See also State v. Tillman, Mo., 454 S.W.2d 923, 926; State v. Grif-

fin, Mo., 336 S.W.2d 364, 367. Appellant's argument is that reference to the car theft in this case does not come within any of the enumerated conditions from State v. Reese, supra; and that there was no time and space relationship proved or shown "other than a * * * two hour and thirty minute period from the theft of the car until its return and discovery of the * * * decedent at 3:41 A.M."

■ The difficulty apparent in appellant's position is that the theft of the Skaggs automobile and its return two hours or so later is part of a single transaction or chain of events, bears a logical relation to the intervening robbery-murder, and tends directly to establish the automobile thief's further guilt of the charge on trial.

The total picture shown by the stated evidence may be briefly stated: Defendant left his home in Crystal City at 1:15 a. m., drove to the parking lot at Pittsburgh Plate Glass Company, "hot wired" and stole the Skaggs automobile, drove to the Standard station in the nearby town of Pevely, lay in wait, robbed the station, killed the attendant, and returned to the scene of the theft. Being unable to return the stolen car to its original parking place, defendant was discovered in possession of fruits of the robbery and tools of the robbery-murder, including weapon, disguise, and the stolen automobile used to get to and from the scene of the crime.

There is no question in these circumstances that the automobile theft connected defendant to the robbery-murder and corroborated his confession, State v. Anderson, Mo., 384 S.W.2d 591, 603[17]; and such connections were relevant as links in the chain of circumstances relied upon by the state to prove his guilt. The evidence with respect to the taking and attempted return of the automobile tended to establish identity of the robber-murderer and his preparation, plan, and scheme for commission of the robbery and avoidance of detection, the manner in which the automo-

bile was taken being simply incidental to its taking for purposes of the robbery. See State v. Turner, 176 La. 528, 146 So. 44, 45[2]. Similarly, in State v. Allen, Mo., 442 S.W.2d 18, defendant was on trial for automobile theft and evidence was admitted that defendant had stolen an automobile license which he used in connection with stealing the car. The court noted that the stolen license plate was an aid in attempting to avoid detection, and concluded that such evidence of a separate crime bore logical relevance in proof of the charged crime of auto theft.

If it be necessary to fit this demonstration into one of the pigeonholes of exception to the general rule from State v. Reese, supra, suffice to say that the evidence with respect to the taking and use of the automobile had probative value on the matters of common scheme or plan embracing two crimes and identity of defendant as the person charged with commission of the crime on trial. Evidence such as that present in this case, which shows the defendant possessed the articles and weapon with which the charged crime was committed, is relevant under one or more of the exceptions to the stated general rule. State v. Smith, Mo., 212 S.W.2d 787, 789[8].

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.