STATE OF Missouri, Respondent,

v.

William R. HINDMAN, Appellant.

No. 9816.

Missouri Court of Appeals,
Springfield District.

Sept. 21, 1976.

Motion for Transfer Denied Oct. 13, 1976.

Application to Transfer Denied
Dec. 13, 1976.

John C. Danforth, Atty. Gen., Sheila K. Hyatt, Asst. Atty. Gen., Jefferson City, for respondent.

Devon F. Sherwood, Springfield, for appellant.

Before STONE, P. J., and HOGAN and TITUS, JJ.

TITUS, Judge.

After a change of judge and a change of venue (Rule 30)[1] a jury found defendant guilty of assault with intent to kill Robert Dugger with malice aforethought (§ 559.-180) but could not agree upon the punishment to be inflicted. The court assessed punishment at 25 years' imprisonment and rendered sentence and judgment accordingly. Rule 27.03.

■ The incidents involved occurred around midnight October 26 to 1 a.m. October 27, 1973. Carroll Renfro, asleep in his home 3 or 4 miles north of Hartville, was awakened "with a pounding on my door." Upon answering the door he was greeted by defendant (whom Renfro did not know) holding a rifle "similar to" the Springfield bolt-action rifle which was a state's exhibit at trial.[2] With the admonition "Don't make me shoot you," defendant obliged Renfro at gunpoint to drive him into Hartville in the latter's pickup truck. Enroute defendant said to Renfro: "They [sic] is a lying, thieving, son-of-a-bitch down here that I have got to kill." Defendant did not identify the object of his disaffection.[3]

After the pickup truck arrived at the Hartville square, defendant directed Renfro to " 'Pull up behind the Courthouse' " and " 'Park there beside where the Sheriff is at.' " Renfro complied. At defendant's invitation to " 'Get out and go down to the door and see if anybody is here,' " Renfro, accompanied by defendant, "knocked and rattled the door, and I told him that there wasn't nobody here. And he said, 'Well, wait just a minute, and there will be somebody here.' "

While Renfro and defendant waited at the rear of the courthouse, they were espied by two boys riding in an automobile. The passenger "knowed Renfro" but didn't know the man with the rifle. They proceeded to find Hartville Police Officer Robert Dugger and tell him of their observation. Dugger drove the city police car to the courthouse and stopped it near Renfro's truck. He testified that when this occurred, defendant "whirled [the gun] right toward the windshield of the [police] car, right directly at me, aiming right in the chest." This caused Officer Dugger to depart. He drove to near the post office and radioed the sheriff for help.

Following the police car's departure, defendant told Renfro "to get out and go on home . . . 'There's going to be a shooting here in just a minute.' " Renfro did not hesitate. As the pickup was driven from the rear of the courthouse leaving defendant behind, Officer Dugger drove away from the post office intending to get behind the truck. When the police car neared the northeast corner of the courtyard "there was a shot, and the back glass popped out of the car. . . . I fell over in the seat . . . my arm up, and then the second shot went off, and that shot come [sic] through the steering wheel . . . and got me in the arm. . . . and another shot . . . that hit the car door, come [sic] through and hit me in the hip. . . . Hit [the] Mace can that I had on. . . . I started on up the street

1. References to rules and statutes are to Missouri Supreme Court Rules of Criminal Procedure, V.A.M.R., and to RSMo 1969, V.A.M.S.

2. The rifle was not admitted into evidence on this identification although it has been held that testimony a weapon "looks like," or "looks familiar," or is "similar" was sufficient to warrant its admission into evidence as an exhibit. *State v. Johnson*, 286 S.W.2d 787, 791[3, 4]

(Mo.1956); *State v. Alderman*, 498 S.W.2d 69, 72 (Mo.App.1973).

3. As required, we recast the evidence in terms most favorable to the verdict and cede to the state the benefit of all reasonable inferences. *State v. Wiley*, 522 S.W.2d 281, 292[19] (Mo. banc 1975); *State v. Patterson*, 534 S.W.2d 847, 850[5] (Mo.App.1976).

. . . and then another shot rang out [that] hit the rear door of the [police] car. . . . After that fourth one, I thought I heard another shot—but I wouldn't say, positive." While several witnesses heard the firing of two or more shots, no one saw who actually fired them.

After the foregoing occurred, Curtis Whiteaker was driving "through the downtown area" of Hartville when he encountered defendant "standing along the side of the street." Defendant, afoot, "stepped out in the street . . . in front of me, and brought his rifle down . . . and said, 'You will stop,' and I stopped." Thereafter, defendant "shoved the rifle" within some 8 inches of Whiteaker's face. We do not know what occurred after Whiteaker said he "shoved the rifle out of my face with my hand," except that he eventually drove away unscathed to see Officer Dugger leaving the scene via an ambulance.

When Sheriff Kelly arrived at the square he was informed where defendant could be found and that defendant wanted to surrender his weapon. The sheriff and a deputy drove to a motor company's lot where they saw defendant "hunkered down . . between the building and a car" holding the rifle in his hand. In response to defendant's statement to " 'Come over here and I will give you this gun,' " the sheriff approached and was handed the rifle which was loaded. Either just before or immediately after being given the rifle, defendant volunteered, " 'I think I shot that there officer's arm off, didn't I?' " The deputy drove the car back to the courthouse while defendant and the sheriff followed on foot. Without being asked any questions, defendant told the sheriff "that he had a bad heart condition, and that he didn't have long to live, and he said, 'I am going to get rid of some of these sons-of-bitches.' " Upon reaching the sheriff's office in the courthouse, defendant was given the "Miranda Warning." Again without being questioned, defendant asked " 'Who was that officer that I shot his arm off?' " and the sheriff replied, " 'That is the City Po-

lice, Bob Dugger.' " To this defendant responded, " 'I don't know Bob Dugger.' "

Within an hour or two after Dugger was wounded, several expended shell casings and live rounds of ammunition were found near the corner of the courthouse atop leaves lying in the courtyard. These, the rifle obtained from defendant, and other ammunition removed from the rifle and defendant's person, were sent to the Missouri Highway Patrol laboratory for testing. Two laboratory technicians testified that the expended shell casings found in the courtyard had been fired in defendant's rifle. Further facts will be related when necessary to discuss the points relied on by defendant in this appeal.

### Second Disqualification of Judge

Although Rule 30.12 permits one change of judge as a matter of right and provides that a defendant may not apply for another change of judge in the same case, defendant contends that the trial judge erred in denying his second application for disqualification. In his brief defendant pens that "[t]he issue is whether a defendant who has previously disqualified a judge under Rule 30.12 V.A.M.R. must face trial before a substitute judge who is biased and prejudiced against him."

The matter arose in this fashion. On June 17, 1974, the trial judge entered the following order: "It appearing to the Court that William R. Hindman is now charged with three charges of felonious assault in the Circuit Court of Webster County, Missouri, said offenses having occurred in Wright County, Missouri, and having been transferred to Webster County on a Change of Venue.

"It further appearing that the said William R. Hindman has not been able to make a bond and is now being held in custody awaiting trial, and that the said William R. Hindman has been involved in several acts of violence, and that he is presently suffering from a heart attack; that by reason of his physical condition it is necessary for him to be, and he is presently confined in a hospital, and because of his violent nature

and the seriousness of the crimes with which he is charged it is necessary to maintain a guard over him 24 hours a day.

"It further appearing that Webster County, Missouri, does not have the facilities to care for said prisoner, and does not have the necessary staff to maintain a guard over said prisoner, and that said care could be provided by the Missouri Department of Corrections.

"IT IS THEREFORE, ORDERED that the said William R. Hindman be delivered to the Missouri Department of Corrections to be held for Webster County, Missouri pending trial on the charges, or until further order of this Court."

Rule 23.10 (relating to magistrates) and Rule 24.23 (relating to circuit courts) state that if a defendant fails to make bond, he "shall be committed to the county jail of the county, *or other safe place.*" (Our emphasis). Defendant does not dispute the authority of the court to commit him to the Department of Corrections as being an "other safe place." Rather, as stated in his motion for a second disqualification, and argued here, defendant asserts the findings made ex parte and without a hearing by the court in its order to the effect that he had "been involved in several acts of violence" and had a "violent nature" indicated such bias and prejudice on the part of the court that the judge should have disqualified himself even though defendant had already been allowed one change of judge.

After a defendant has been afforded one change of judge under Rule 30.12, the successor judge is under a duty to remain as judge in the cause, and this duty is equally as strong as his duty to recuse himself under circumstances requiring it. *Euge v. Trantina,* 298 F.Supp. 876[2] (E.D.Mo.1969). Defendant does not here challenge the accuracy of the findings made in the order set out above and has never undertaken to prove the facts to be otherwise than stated therein. His conclusion the judge was biased and prejudiced against him is simply predicated upon the findings of fact enumerated in the order and the court's determination it would be better that defendant

be held for Webster County in the custody of the Missouri Department of Corrections.

No one doubts that if the trial judge was, in fact, for any reason biased and prejudiced against the defendant, he should have recused himself to insure defendant of a fair trial. However, motions and other pleadings do not prove themselves [*Fulton v. Fulton,* 528 S.W.2d 146, 157 (Mo.App. 1975)]; neither do statements in briefs [*State v. Hamblin,* 448 S.W.2d 603, 606[2] (Mo.1970); *State v. Reid,* 391 S.W.2d 200, 205[8] (Mo.1965)], and proof of bias and prejudice cannot be bottomed on naked claims printed in a motion or a brief. *State v. Freeman,* 489 S.W.2d 749, 753[12] (Mo. App.1973).

The authorities cited to this point by defendant in his original brief are not contradictory of what we have said. In his reply brief defendant cites *Bonner v. State,* 82 Okl.Cr. 381, 170 P.2d 1020, 1022[3] (1946). Unlike the present situation, in *Bonner* there was no Oklahoma statute or rule similar to Rules 23.10 and 24.23, the order made by the committing court did not give any reason for the court's action, and the question of the trial judge's bias and prejudice was not involved. While the author of *Bonner* opined that in the future hearings should be conducted upon the propriety of committing a defendant to the penitentiary before trial, the lack of such in *Bonner* did not serve to vitiate the conviction. This point is denied to defendant.

### Instruction No. 11 (MAI–CR 4.50)

At the close of the evidence and before arguments, the court, in the words of MAI–CR 4.50, instructed the jury that if it found defendant guilty but could not agree on punishment the court, in such event, would fix the punishment. The giving of this instruction at the time involved has been approved repeatedly, and the complaints voiced against it by defendant have been so often aired and answered there is no reason for us to do so again. The point is denied. *State v. Brown,* 443 S.W.2d 805, 809–811[6, 7] (Mo. banc 1969); *State v. Bol-*

*den*, 494 S.W.2d 61, 67 (Mo.1973); *State v. Daugherty*, 484 S.W.2d 236, 238[3] (Mo.1972); *State v. Lincoln*, 482 S.W.2d 424, 426[6] (Mo.1972); *State v. Scott*, 535 S.W.2d 281, 285[4] (Mo.App.1976); *State v. Kirk*, 510 S.W.2d 196, 201–202[18] (Mo.App.1974); *State v. Cain*, 507 S.W.2d 437, 442[13] (Mo.App.1974); *State v. Fisher*, 504 S.W.2d 281, 284[4] (Mo.App.1973).

### "I Think" or "I Believe" Statements

██ Defendant says the trial court erred in admitting statements attributed to him that "I think (or believe) I shot an officer's arm off," because they "were mere expressions of opinion or belief and as such did not constitute proper admission nor were they relevant." What one thinks or believes ordinarily is not substantial evidence upon which one may rely to establish a fact. *Dill v. Poindexter Tile Company*, 451 S.W.2d 365, 372[11] (Mo.App.1970). Nevertheless, there is a difference between use of a declaration of belief to prove a fact and employment of the declaration as an admission against interest which tends to incriminate or connect the speaker with the crime charged. "Any statements made by a defendant, which tend to incriminate him or connect him with the crime charged, are admissible when voluntarily made." *State v. Sinovich*, 329 Mo. 909, 917, 46 S.W.2d 877, 881[15] (1932); *State v. Gregg*, 399 S.W.2d 7, 10 (Mo.1966); *State v. Thresher*, 350 S.W.2d 1, 9[18] (Mo.1961). A statement which manifests a consciousness of guilt is an admission against interest [*State v. Patterson*, 516 S.W.2d 571, 573[3] (Mo.App.1974)], and the statements of which defendant now complains clearly fall in that category for they tend to associate him with the crime for which he was charged. As indicated, we rule this point against defendant.

### Witnesses Nilgus and Buel

These witnesses were laboratory technicians employed by the Missouri State Highway Patrol. Their duties included examination and comparison of firearms; they also recounted their several years each of expertise to qualify them as ballisticians. The witnesses had fired defendant's rifle, microscopically examined the rifle casings thus obtained with those recovered from the courtyard shortly after the shooting, and concluded the casings found near the courthouse had been fired in defendant's rifle. Defendant now asserts it was error to admit their testimony because neither was qualified and the conditions under which they conducted their experiments were "not shown to be sufficiently like those existing at the time of the offense to be relevant."

██ One trouble with this point is that Mr. Buel testified without objection. Ergo, defendant's complaint as to his testimony is not preserved for review. *State v. Wallace*, 504 S.W.2d 67, 71[7] (Mo.1973); *State v. Vineyard*, 497 S.W.2d 821, 829[18] (Mo.App.1973). Another fault with the point is that at trial no objection was made to the experts' testimony based on the conditions under which the test firings were conducted. Points raised on appeal as to the admissibility of evidence must be based on the same theory of the objection made at trial. *State v. Lang*, 515 S.W.2d 507, 511[8] (Mo.1974); *State v. Jones*, 515 S.W.2d 504, 506[3] (Mo.1974).

██ Whether a person qualifies as an expert and whether an expert opinion is permissible on a particular subject are questions to be decided by the trial court in the exercise of its sound discretion. Upon review we are confined to the issue of an abuse of discretion and may not reverse in the absence of abuse which is prejudicial to the defendant. *State v. Jones*, 518 S.W.2d 304, 311[8, 9] (Mo.App.1975). Ballistic comparisons are a proper subject for expert testimony, and we find sufficient special experience, training and knowledge on the part of Mr. Nilgus to qualify him as a ballistician. We find no abuse on the part of the trial court in admitting his expert testimony and the point is denied.

### Numbness In Victim's Arm

██ Defendant next says it was error to admit Officer Dugger's testimony that he was experiencing numbness in his

wounded arm because he was not qualified to testify to that fact and because such testimony was prejudicially irrelevant as its only purpose was to excite sympathy. A nonexpert witness is competent to state simple inferences drawn by him from his own conscious subjective sensations as to his physical condition, physical symptoms or sympathetic symptoms. 32 C.J.S. Evidence § 546(22), pp. 149–154. Officer Dugger was qualified to state that he had numbness in his arm where he was shot.

In Missouri and elsewhere, it is the rule that the physical condition of an assault victim is admissible to show the nature and character of the assault. *State v. Williams*, 532 S.W.2d 826, 828[1–3] (Mo.App.1975); *State v. Jackson*, 500 S.W.2d 306, 311[10] (Mo.App.1973); Annot., 87 A.L.R.2d 926–943 (1963).

This point has no merit.

### Defendant's Statements

 In addition to defendant's other complaints, he asserts the statement-testimony of Renfro, Sheriff Kelly and Deputy Mings should have been excluded because the statements laid to defendant were not voluntarily made and were not timely disclosed in response to his request under Rule 25.32.

Much of defendant's argument to this point is patently inaccurate. His claim that counsel did not know of the utterances attributed to him until the day before trial is untrue. Defendant's motion to suppress demonstrated advance knowledge by his counsel of the intended statement-testimony of Renfro and Sheriff Kelly. Likewise, interrogation of the sheriff by defendant's counsel at the hearing held on the motion to suppress disclosed the sheriff had previously given the same statement-testimony at the preliminary hearing. Furthermore, when Renfro testified at trial as to defendant's statements on the occasion in question, no objection was made to Renfro's statement-testimony and we will not entertain an objection thereto when raised for the first time on appeal. *State v. Stevens*, 467 S.W.2d 10, 19–20[7] (Mo.1971), 50 A.L.

R.3d 96, 108[7], cert. den. 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971).

 The only statement-testimony not disclosed to defendant's counsel until the eve of trial (recounted by the sheriff and his deputy), was defendant's voluntary post-Miranda question of " 'Who was the officer that I shot his arm off?' " The prosecutor testified he did not know of this until the day before trial when he conveyed the information to defendant's lawyers. In *State v. Scott*, 508 S.W.2d 302, 304[1] (Mo. App.1974), it was observed that the purpose of requiring the state to disclose the substance of oral statements made by the accused is to allow the defense to prepare properly for trial and particularly for cross-examination. In this instance, counsel makes no complaint of being unable to prepare for trial because of the short notice anent the post-Miranda statement. As the statement was almost identical to previous well-known statements attributed to defendant, and as the record does not disclose that counsel's cross-examination was impaired in any way because of the short notice, we are unable to find prejudicial error. *State v. Gay*, 523 S.W.2d 138, 143[11, 12] (Mo.App.1975).

 Another segment of this point with which we do not agree is defendant's argument that because he had ingested prescription drugs and consumed whisky the day and evening prior to the events in question he was rendered in such a dazed and clouded state as to make his actions and statements involuntary due to lack of capacity. It is generally agreed among authorities that drug influence or intoxication at the time of making a statement or confession does not require exclusion because not voluntarily, knowingly and intelligently made unless the intoxication or drug influence amounts to mania. The fact of drug influence and intoxication, absent mania, only goes to the credibility and weight of the statement. Before exclusion is required, it should appear that defendant was so intoxicated or influenced that he was unable to appreciate the consequences and

nature of his statements. *State v. Heather*, 498 S.W.2d 300, 304[5] (Mo.App.1973), and authorities there cited. The witnesses testified defendant appeared coherent and lucid at the times he made the reported statements—at least there was no testimony, save defendant's, which would indicate mania. Neither the trial court nor the jury was bound to accept defendant's testimony as to his condition and could properly find the statements were voluntarily, knowingly and intelligently made. For the reasons aforesaid, this point is ruled against defendant.

### Physicians' Desk Reference Book

Defendant produced Robert West, a licensed pharmacist, and a book labeled "Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals." The purpose of the witness and the book was (1) to have West say that by use of the pictures in the book,[4] he could state what a certain pill, tablet or capsule was or what it contained, (2) to ultimately have defendant testify (since he was not qualified to state what medication he had ingested) that he had taken four blue pills that looked like a picture in the book which would identify them as ten milligram Valium pills, and (3) thereby lay the foundation for introduction of a physician's deposition wherein he opined as to the effect a specific dosage of Valium and a specified amount of liquor would have on a person's physical and mental condition. When interrogated, however, West said that he could not accurately say what a certain pill was by comparing it with pictures contained in the book, there would be different kinds of pills having an appearance similar to Valium as pictured in the book, and there would be no way of knowing what any particular pill contained without a chemical analysis thereof. The trial court struck Mr. West's testimony and instructed the jury to disregard it. Defendant now contends it was error to refuse to permit West to identify a portion of the book "as being a fair and accurate repre-

sentation of a ten milligram Valium tablet for the reason that the same constituted relevant evidence on material issues in the case, i. e., the voluntariness of certain statements purportedly made by Appellant and his mental state at the time of the alleged offense."

Although, as noted under the last considered point, intoxication or drug influence may be relevant to the voluntariness of incriminating statements, "the rule in Missouri is that voluntary intoxication [either by alcohol or drug consumption] is not a defense to a criminal charge and that the rule does not even allow a jury to consider such intoxication on the issue of specific intent." *State v. Richardson*, 495 S.W.2d 435, 440[6] (Mo. banc 1973). Defendant admitted his consumption of drugs and liquor prior to crime was voluntary. Thus, even had Mr. West served as a proper link in a chain of evidence to establish that defendant had, in fact, voluntarily ingested Valium tablets, exclusion of his testimony would not have been prejudicial on the issue of specific intent or state of mind. Nevertheless, West's testimony did not produce a proper link. To repeat in summary, his testimony caponized the book as a sure and fertile source for ascertaining with certainty the true and accurate identity of a pill. With the evidence in this state, attempted further use of the book would be an exercise in otiosity and the trial court did not err in its ruling.

### Evidence of Other Crimes

In two points, which we consider in one, defendant asseverates the trial court erred in admitting the testimony of Carroll Renfro (who was forced to drive defendant into Hartville) and Curtis Whiteaker (who was halted at rifle point by defendant shortly after the shooting of Officer Dugger) because their recountings evidenced the commission of separate and distinct crimes.

There is a legal legend regarding the impropriety of proving an accused

---

4. Hopefully admissible as an exception to the hearsay rule. *Baker v. Atkins*, 258 S.W.2d 16, 20–21[8–10] (Mo.App.1953).

guilty of crimes separate and distinct from the one charged as it violates the accused's right to be tried only for the offense for which he stands charged. But exceptions to this rule of exclusion are equally forceful as the rule itself. Evidence of other crimes is deemed proper when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime at trial. *State v. Reese*, 364 Mo. 1221, 1226, 274 S.W.2d 304, 307 (banc 1955). In other words, if evidence of other crimes has a reasonable tendency to prove a material fact in issue, it should not be obliterated because it incidentally proves defendant guilty of other offenses. *State v. Kilgore*, 447 S.W.2d 544, 547[3] (Mo.1969). Also, "where the circumstances are such as to constitute one continuous transaction in the accomplishment of a common design so that proof of one cannot be made without showing the facts, the entire facts are admissible, since they are regarded as part of the 'res gestae.' In such circumstances, the state is not required to nicely shift and separate the evidence." *State v. Jackson*, 519 S.W.2d 551, 558[19] (Mo.App.1975).

■ To be remembered is that while several witnesses heard shots being fired, no witness actually saw defendant shooting at Officer Dugger or the police car he occupied. There is no question but that the testimony of Renfro served to show defendant's intent and motive for wanting to get to Hartville. It also was proof of malice aforethought. The circumstances of the assault and abduction of Renfro served to connect defendant to the assault on Officer Dugger and were relevant as links in the chain of circumstances relied upon by the state to prove defendant's guilt. Likewise, the testimony of Whiteaker was probative of defendant's criminal agency in the case for it served to identify defendant as being in possession of a rifle and employing it in a threatening manner within minutes after the shooting. In fine, the testimony of these two witnesses demonstrated a chain of events tending to prove defendant's intent and motive for going to Hartville and showed a common scheme or plan embracing the commission of crimes so related that their revelation tended to prove defendant's criminal agency in the crime for which he was being tried. *State v. Knupp*, 507 S.W.2d 360, 361[1] (Mo.1974); *State v. Bolden*, 494 S.W.2d 61, 65[3–7] (Mo.1973); *State v. Boyer*, 476 S.W.2d 613, 616–617[2] (Mo.1972); *State v. Bevineau*, 460 S.W.2d 683, 686[3] (Mo.1970); *State v. Diamond*, 532 S.W.2d 873, 876–877[6–11] (Mo.App. 1976); *State v. Morris*, 523 S.W.2d 329, 331[4–6] (Mo.App.1975). In addition to other reasons why Whiteaker's testimony was proper is that evidence which shows that following the crime charged defendant possessed the weapon with which the crime was committed is relevant under one of the exceptions to the general rule that the state is not ordinarily allowed to show other crimes. *State v. Smith*, 358 Mo. 1, 212 S.W.2d 787, 789 (1948); *State v. Armbruster*, 541 S.W.2d 357 (Mo.App.Spfd.Dist. 1976). Admission of the testimony of Renfro and Whiteaker was not error.

### Motion for Judgment of Acquittal

■ Finally, defendant contends the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence and argues that the only thing the state proved was that someone shot Officer Dugger, that defendant was in the area at the time of the shooting, and that defendant's rifle had been fired. We disagree.

The evidence, in short, showed this: Defendant, at gunpoint, forced Renfro to drive him to Hartville accompanied by the statement " 'They [sic] is a lying, thieving, son-of-a-bitch down here that I have got to kill.' " Upon arriving at the courthouse in Hartville when Officer Dugger approached, defendant pointed his rifle at the police car. After the police car was driven away, defendant told Renfro to leave because " 'There's going to be a shooting here in just a minute,' " and shortly thereafter shots were heard and four bullets struck the police car, one of which wounded Offi-

cer Dugger. A short time subsequent to the shooting, Whiteaker saw defendant with a rifle which he pointed at the witness in a threatening manner, and when Sheriff Kelly arrived he found defendant in possession of a rifle and was told by defendant " 'I think I shot that there officer's arm off.' " The shell casings found in the courtyard had been fired in defendant's rifle. This evidence and the reasonable inferences deducible therefrom were sufficient to support the verdict of guilty.

The judgment is affirmed.

All concur.