STATE of Missouri, Respondent,

v.

Jack GILLESPIE, alias Jack Masoner, Appellant.

STATE of Missouri, Respondent,

v.

Michael Joseph NOVOGRADAC, Appellant.

Nos. 47734, 47737.

Supreme Court of Missouri,

Division No. 2.

June 13, 1960.

Appellants' Motion for Rehearing or Transfer to Court En Banc Denied.
July 11, 1960.

Louis A. Reale, Stanford M. Katz, Kansas City, for appellants.

John M. Dalton, Atty. Gen., W. H. Bates, Special Asst. Atty. Gen., for respondent.

EAGER, Judge.

The defendants were tried jointly and convicted of felonious assault, with malice, on one William Messer. The jury assessed the punishment of each at confinement in the penitentiary for a term of twenty-five years. The occurrences giving rise to the prosecution took place in the Jackson County Jail in Kansas City on January 26–30, 1959. Messer was a prisoner there as were also the defendants and the witnesses Jorld Rutledge and Billy Dean Harter. We find it necessary to state the facts in some detail.

All the participants were occupants of a section of the jail described as "D Tank"; this was on the twelfth floor of the Courthouse building. It consisted of an area perhaps 30 x 40 feet, with an open space or "bull pen" in the center; there were showers, toilets and other facilities at one end, and six eight-man cells ranged along one side. The cells were separated from the center room by a barred runway. There were tables and benches in the large room, and apparently all inmates had access to all parts of the place. No deputy sheriffs or other guards were on duty inside this area, and apparently they came in only occasionally, with food or on other specific errands. At this particular time, and evidently for a time long past, a practice had grown up of permitting a so-called "key man," with assistance from his associates who stayed in the "key-cell," to control and supervise the internal functioning and operations of the "tank," and, to a large extent, of its inmates. At this time the so-called "key man" was one Don Reed; his cellmates, sometimes referred to as "key men," were these defendants, and inmates Kukovich, Snow, Turner and Thomas. These men occupied the key cell, No. 6; Reed, with their assistance, assigned the prisoners to cells, distributed the food, and assigned the menial duties to others, including all cleaning and washing dishes; it also appears that Reed, or he and his associates, compiled the list of those entitled to go on sick call. It was not shown how Reed was chosen for this supervisory position. By the admission of one defendant, these men at least got more food than the others, and they were apparently relieved of the menial duties.

The evidence was such that the jury could reasonably find all the facts now related. Soon after Messer entered the jail in January 1959, these key men, including the present defendants, made him take a series of cold showers. It was claimed by one defendant in attempted explanation that Messer did not take enough baths, but this was disputed in other testimony. In any event, Messer soon grew weary of these cold showers, so he ran out of the shower and beat on the "tank" wall in an effort to attract the attention of a deputy sheriff. Thereupon the "key men," including these defendants, dragged him back to Cell No. 5 and there administered a severe beating with their fists. Other prisoners heard the blows and the "hollering" of Messer. These defendants were identified as active participants and Novogradac partially confirmed his part on cross-examination. Messer received compound fractures of both lower jaws, in addition to sundry lesser injuries. At the conclusion of this beating defendant Gillespie made a "rope" out of a wet towel, made Messer bend over, and beat him on the back until the blood was "into a clot." For the next three or four days various abuses and indignities to Messer continued, all inflicted or caused by the same group. They burned his abdomen and side seven times with live cigarettes; these two defendants and another forced Messer and another prisoner to engage in one or more sodomitish acts; Gillespie put a live cockroach in his mouth and another "key man" forced him to swallow it by stepping on his stomach. At times the "key men" would call Messer out of his cell, put a rope around his neck, make him get down on his hands and knees and bark, make him "fight" another prisoner like a dog, and eat lunch meat off the floor. It was stated that Kukovich applied the rope, but that the other "key men" would stand around. Two other prisoners received the same treatment, this being shown without objection. This performance was enforced by beating, when necessary, with these defendants specifically named as participants. It was shown, without objection, that during this period Reed refused on two or three occasions to let Messer go on sick call.

During these three or four days Messer remained in constant pain, was unable to eat, and found it difficult to drink water. On January 30, 1959, when taken out of jail for his preliminary hearing, one side of

his jaw was hanging down and his face was severly swollen; his condition was thus finally discovered, and he was sent to the General Hospital. At that time it was "mechanically impossible" for him to close his mouth completely. His jaws were operated upon under anesthetic, his teeth were wired together, and he was given medication to combat infection. He remained in the hospital until February 13th, returning from the jail at intervals thereafter for observation. His condition worsened, however, and he re-entered the hospital on March 30, with swelling, drainage and pain. Another operation was performed. The surgeon testified that he still could not tell in the latter part of May whether the patient would ever have normal function in his jaws or not.

There are no briefs on behalf of appellants, so we consider the matters properly raised in the motions for new trial. These motions contain many general and routine assignments which are wholly insufficient under Rule 27.20, V.A.M.R. It would unduly encumber this opinion to list all of these and to explain, with authorities, why each is insufficient. We do not propose to do so. These motions were prepared by counsel. The Bar should be reasonably well advised by now of the requirements of this rule.

■■■ Where necessary to distinguish between the separate motions, we shall do so. Defendant Gillespie asserts that the information is indefinite and vague, that it charges no criminal offense, and that it does not inform the defendant of the "special character of the charge." We find no merit in these contentions. The information charged that defendants did "on or about the 28th day of January, 1959 * * * unlawfully, wilfully and feloniously and with malice aforethought, make an assault upon one William R. Messer, with their fists, likely to do great bodily harm, with the felonious intent the said William R. Messer to do great bodily harm * * *." The allegation of malice brought the charge within § 559.180 (all statutory references are to RSMo 1949, V.A.M.S.), as distinguished from the lesser charge of the following section, 559.190. The existence of malice is the basic distinction between the two offenses. State v. Cooper, 358 Mo. 269, 214 S.W.2d 19. Essentially, the allegations of the information follow the statute, and this is ordinarily sufficient. State v. Brown, Mo.App., 149 S.W.2d 414; State v. Groves, Mo., 159 S.W.2d 773. It alleges an assault on a specified person, the existence of malice, the means used, and the intent. The allegation of time is sufficient. Honey v. Kaiser, Banc, 352 Mo. 1120, 181 S.W.2d 492; Rule 24.11. Our principal consideration of this information has been directed at two points which we raise of our own motion, since we consider the information independently. These are: (1) May an assault with the fists suffice under § 559.-180? And, (2) Is an intent "to do great bodily harm" sufficient? We answer both questions in the affirmative. As to (1): While ordinarily an assault under this section involves the use of a weapon, the words "or by any other means or force likely to produce death or great bodily harm" have been used with a definite purpose and meaning. We hold that a violent and aggravated assault with the fists may constitute a crime under this section. In State v. Spradlin, 363 Mo. 940, 254 S.W.2d 660, 661, it was held that evidence of a "deliberate and serious" assault on an elderly woman with the defendant's fists and hands was sufficient to constitute a crime under this section. The case of State v. Null, 355 Mo. 1034, 199 S.W.2d 639, where the information was considered insufficient under the "malice" section, is probably distinguishable on the wording of the information, on the contentions of the State, and because our exact question was not ruled. In any event, we prefer to follow the later case. If evidence of a beating with the fists is sufficient to sustain such a charge (see Spradlin, supra), then we should not rule the information bad, pending the development of the evidence. Here the evidence has shown a most aggravated assault which was not only "likely to," but did actually

cause "great bodily harm." We note also that the classification of weapons as "deadly" may depend upon the effect produced by them, and the strength of the assailant. State v. Henderson, 356 Mo. 1072, 204 S.W. 2d 774. Judged by that standard, the fists of five or six assailants here were most certainly a "means or force likely to produce * * * great bodily harm." We do not mean to say that one who engages in an ordinary fistic encounter or assault with his fists may or should be prosecuted under this statute.

As to (2): The information states an intent "to do great bodily harm," rather than an intent to "maim," the latter being one of the alternative statutory words. In State v. Foster, 281 Mo. 618, 220 S.W. 958, loc. cit. 959, the court said in part, in considering an information: "The addition of the words 'and commit great bodily harm,' following the word 'maim' in the information, is also a subject of complaint. In what respect the appellant is injured by this addition we are not told. The added words are the equivalents of an averment of an intent on the part of the appellant to inflict an injury permanent in its nature or more serious than an ordinary battery. Territory v. Ayer, 15 N.M. 581, 113 P. 604; Lambert v. State, 80 Neb. 562, 114 N.W. 775; Boykin v. People, 22 Colo. 503, 45 P. 419; State v. West, 45 La.Ann. 14, 12 So. 7; McDonald v. State, 89 Tenn. 161, 14 S.W. 487. In short, they mean nothing more than is expressed by the word 'maim,' and the only tenable objection which can be urged to their use is that it is tautological." And see, for the modern and broadened definitions of the word "maim": Black's Law Dictionary, 4th Ed., p. 1104; Webster's New International Dictionary, 2nd Ed., p. 1483; State v. Thomas, 157 Kan. 526, 142 P. 2d 692; 322 U.S. 739, 64 S.Ct. 1055, 88 L.Ed. 1573; 57 C.J.S. Mayhem § 1, p. 461; Shackelford v. Commonwealth of Virginia, 183 Va. 423, 32 S.E.2d 682. The question is largely foreclosed by our decision in State v. Hardy, 359 Mo. 1169, 225 S.W.2d 693, loc. cit. 696, where the court said, in part:

"The second ground of attack is that it 'is not a violation of § 4408 [V.A.M.S. § 559.180] to make an assault with intent *"to do some great personal injury or bodily harm."'* * * * It is true that § 4408, in specifying the intent, does not use the words we have italicized, but it does employ the word 'maim,' among others. Where intent is an element of the offense, it should be alleged substantially in the words of the statute. 6 C.J.S. Assault and Battery § 106." Then, after quoting from the opinion in State v. Foster, supra, the court said: "It follows, therefore, that the allegation of an intent 'to do great personal injury or bodily harm' is the equivalent of an allegation of an intent to maim, and so within the terms of the statute." We hold this information sufficient. We do not, however, approve the practice of departing from statutory wording and entering experimental fields. In this holding we have also considered Rule 24.11; the irregularity last discussed certainly did not prejudice the substantial rights of the defendants on the merits.

At the beginning of the trial the court overruled an oral request to require the State to elect "as to the specific incident" with which defendants would be charged. This involved a matter of evidence, not an election between different statutory offenses. There was no error.

Both defendants now assert that the court should have directed a verdict of acquittal. Our recital of the facts really answers that contention. There was ample evidence to support a finding that these five or six men acted in concert with a common intent, and in effect in a conspiracy, against Messer. The acts of one were the acts of all. State v. Hicks, 353 Mo. 950, 185 S.W.. 2d 650; State v. Menz, 341 Mo. 74, 106 S. W.2d 440. An instruction on acting together with a common intent was given, and properly so. It is not necessary to prove an agreement to commit a crime (Menz, supra) in order to establish a conspiracy. Moreover, these defendants were specifically named by Messer as among ·

those who beat him in No. 5 cell, breaking his jaws and inflicting other injuries; they were also identified as participating in various other abuses. It seems to be claimed that the State's evidence was insufficient because: the witnesses were jail inmates convicted of crimes, their testimony was not "corroborated," and their evidence at the trial was contradictory to that at the preliminary hearing (on which latter no showing whatever was made.) All this merely involved a matter of credibility for the jury to determine. There is no rule of law requiring "corroboration" in such cases. So far as intent and malice were concerned, the evidence was ample under any recognized definition.

■ An assignment is made, perhaps inadequately, that the court erred in admitting evidence of "subsequent crimes" (motion of Novogradac) and of "immoral practices and other illegal acts" (motion of Gillespie) prior and subsequent, and not related to the crime charged. We shall consider this. Some of the acts there shown were crimes, and some may or may not have been. The rule as to the admissibility of evidence of other criminal acts has often been stated. As said in State v. Hendrix, Mo., 310 S.W.2d 852, loc. cit. 855: "It is generally true that proof of another crime not related to the cause on trial cannot be shown. State v. Leonard, Mo., 182 S.W.2d 548; State v. Atkinson, Mo., 293 S.W.2d 941; State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920; State v. Ingram, Mo., 286 S.W.2d 733; State v. Griffin, Mo.App., 289 S.W.2d 455; but there are very definite exceptions to this rule. In State v. Saussele, Mo., 265 S.W.2d 290, the court said at loc. cit. 296: '* * * We hold that this was within the rule stated in State v. Kornegger [363 Mo. 968], 255 S.W.2d 765, loc. cit. 768, as follows: "Where the proof of other offenses may tend to establish motive, or intent, or absence of accident or mistake, or identity of the defendant, or a common scheme or plan embracing the commission of separate similar offenses so interrelated to each other that proof of one tends to es-

tablish the other, such other offenses are widely held under these circumstances to be admissible in proof." See also State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878; State v. Nienaber, 347 Mo. 541, 148 S.W.2d 537; State v. Spinks, 344 Mo. 105, 125 S.W.2d 60; and State v. King, 342 Mo. 975, 119 S.W.2d 277. * * *' See also: State v. Bradford, 362 Mo. 226, 240 S.W.2d 930; State v. Atkinson, supra; State v. Flores, 332 Mo. 74, 55 S.W.2d 953, 955; State v. Garrison, 342 Mo. 453, 116 S.W.2d 23, 25. In the latter case it was said: '* * * "Evidence covering the commission of other offenses is admissible when two or more crimes are so linked together in point of time or circumstances that one cannot be fully shown without proving the other. * * *"'" And see particularly State v. Fisher, Mo., 302 S.W.2d 902, 905, where evidence of the defendant's acts, pugnacious conduct and prior assaults on others were held to be admissible as showing a "continuing and inseparable factual background" relevant to proof of the nature of defendant's subsequent assault on another person, for which he was on trial. We note the case of State v. Atkinson, Mo., 293 S.W.2d 941, but there the evidence received was of similar but unconnected crimes against others and no questions of intent or malice or aggravation were conceivably involved. It was also held, however, that prior similar offenses against the complaining witness could properly be shown, the rule being somewhat broader in sex offenses.

Here it was shown that Messer was kept in a state of utter physical and mental domination by these defendants and their accomplices for a period of three or four days. All their subsequent acts constituted an aggravation and a continuation of the original assault, and proof of these constituted evidence of a "common scheme or plan" embracing the commission of the whole series of related abuses and offenses. These acts constituted an aggravation and continuation of the initial assault in a physical sense, a legal sense, and a moral sense. Specifically, this evidence also tend-

ed to show the malice and the intent inherent in the commission of the original assault. Both by their own participation and through the concert of action, the defendants were responsible for these subsequent abuses. The law need not be so technical or blinded to reality as to ignore a major part of such an infamous scheme. We hold that the court did not err in admitting the evidence.

■ Both defendants assert that the punishment is excessive. Any sentence up to life imprisonment may be assessed for assault with malice under § 559.180. The fixing of the punishment within the statutory limits was for the jury. The trial court did not see fit to interfere, nor do we. See the discussion of this point in State v. Laster, Banc, 365 Mo. 1076, 293 S.W.2d 300, 304–305. Defendants also complain of the prejudicial effect of an article in the Kansas City Times on May 27, 1959 (which one juror stated, upon inquiry, that he had read) and of the failure of the court to discharge the jury. Gillespie also complains of the effect of numerous newspaper articles appearing during the trial. No record was made of the contents of any such article or articles; no request was made for any further interrogation when the court asked the jury how many had read a specified news article and one juror said that he had. The court cautioned the jury precisely at that time against forming opinions from news articles or radio. No point has been properly preserved on this, nor has prejudice been demonstrated.

■ Defendant Gillespie asserts that he could not have a fair trial in Jackson County. At no time did he apply for a change of venue under § 508.090 (as amended Laws 1957, p. 294.) Certainly it was not the duty of the court to send the case to another county on its own motion. Complaint is also made of arguments of the Assistant Prosecutor referring to "immoral practices" and to prior and subsequent "illegal acts." We have held that evidence of these was admissible; if the evidence was

admissible, it could be fairly commented on. Moreover, there were no objections whatever to the argument.

We have further reviewed those record matters which we must examine regardless of assignments of error and we find no error therein prejudicial to defendants. Both judgments are hereby affirmed.

All concur.