STATE of Missouri, Respondent,

v.

Robin Scott GREATHOUSE, Appellant.

No. 62229.

Supreme Court of Missouri,
Division No. 1.

Feb. 9, 1982.

Rehearing Overruled March 9, 1982.

Richard T. Martin, Gainesville, for appellant.

John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

DORMAN L. STEELMAN, Special Judge.

This is a direct appeal from a conviction for capital murder, Sec. 565.001, RSMo, with a sentence of life imprisonment without eligibility for parole for fifty years. This court has jurisdiction pursuant to Mo. Const. art. V, Sec. 3.

On Tuesday, September 5, 1978, citizens informed a Douglas County deputy sheriff, Jenkins, that Clayton Dawson might be missing. Dawson was a sixty-six year old man who lived in a trailer near Ava, Missouri, with his nephew whom he had raised since infancy. The nephew, Robin Scott Greathouse, 17 years old, called his uncle "dad." The last time the neighbors saw Dawson was on Thursday night, August 31. On Friday, a neighbor saw Dawson's truck leave the premises but did not see the driver. Dawson did not report or call in for work Friday, an unprecedented occurrence. From Friday through Tuesday, Robin answered inquiries about Dawson by saying that he had "left with some lady," and that he had gone to West Plains to visit a cousin. On Wednesday morning, Jenkins and another officer visited Dawson's trailer. Robin accompanied Jenkins and the other officer, Deputy Thurman, to the Sheriff's office in Ava where Robin admitted he had killed his uncle, and led several officers to the remains of the body and back to the trailer where he showed them the rifle and reenacted his version of the killing. According to Robin, he and his dad had a fight because Robin had not been going to school. His dad was going to give him a thrashing and he got scared and hit his dad with an ax and then, after fighting over a gun, shot him eight times.

The first of appellant's four claims on this appeal is that his statements to law enforcement officials should have been suppressed because the first of these statements was made before appellant was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The principal issue under this point is whether the statement in question was the product of "custodial interroga-

tion" such that *Miranda* warnings were required to make it admissible. *Id.*, 384 U.S. at 444, 86 S.Ct. at 1612.

The trial court could reasonably have found the relevant facts to be as follows: On September 5, 1978, when Clayton Dawson had not been seen by neighbors for five days, a neighbor contacted Deputy Lester Jenkins who also lived near Dawson and appellant and knew them both very well. The next morning (Wednesday, September 6), Jenkins and another deputy, Alva Thurman, went to the trailer where Dawson and appellant lived and, finding appellant there, asked him about Dawson. Appellant told the officers that Dawson had left at 5:00 a.m. the previous Friday in the company of a brown-haired woman of medium height driving a red 1975 or 1976 Buick Electra with the intent of getting married; that he was not supposed to tell anyone where they had gone and that, because they had been expected back on Tuesday or Wednesday (the day of appellant's statement was Wednesday), he "wished [he] did know" where they were at that moment. When Thurman noticed some paper-covered holes in the wall of the trailer, appellant said that he had "shot up the house" when he was drunk and that he didn't want his "dad" to see the holes when he came home. Jenkins asked appellant if he wanted to go into town with them to telephone the details of Dawson's absence to the Highway Patrol in Willow Springs for broadcast over their radio, and said that appellant didn't have to go unless he wanted to, to which appellant replied that he would go with them.

Shortly after appellant and Thurman arrived at the Sheriff's office, Thurman was required to leave to assist in the feeding of prisoners in the jail. Thurman told appellant that he could either wait in the front office or, since several people had been coming into the office to ask about Dawson's whereabouts, he could wait in the back, where there were some empty cells, commonly used for women and juveniles; appellant replied, "I'd rather go in the back if you've got a place." Thurman took appel-

lant to an empty cell and locked the door behind him, not to keep appellant in but as a matter of jail policy because a prisoner had once escaped through that area. Appellant was told to "holler or knock on the walls" if he wanted anyone for anything. Sometime after Thurman had gone, Jenkins arrived at the office, unlocked the cell block door and took appellant to another room where they could talk. Jenkins said to appellant, "Robbie, I've been a good friend of you and your dad a long time . . . I'd like for you to tell me where we can find your dad because . . . [t]hat woman he went off with could have killed him or something." Jenkins further told appellant that Dawson's friends and neighbors were worried about him and reminded appellant that he had said Dawson was expected back Tuesday or Wednesday and it was now Wednesday afternoon. At this, appellant broke down crying and said, "Lester, I shot him. I killed him and took him over on UU Highway." After this statement, Jenkins also broke down and left the room and appellant was not questioned further until after he had been advised of and waived his *Miranda* rights. When Thurman returned, Jenkins told him what had occurred and Thurman gave appellant his *Miranda* rights and took his statement. Twenty minutes later, a Highway Patrol Officer read him his rights and took his statement. Prior to appellant's unsolicited and voluntary statement, he was not suspected of any crime by either Jenkins or Thurman (as stated by Jenkins, "I just didn't think he'd do anything like that") and appellant was not under arrest or otherwise in custody.

Under the above facts, the statement by appellant was clearly not a product of custodial interrogation and no *Miranda* warnings were required to make it admissible. As stated by the United States Supreme Court in *Miranda* :

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person *has been taken into custody or otherwise deprived of his freedom of action in any significant way.*" (Emphasis supplied)

*Id.,* 384 U.S. at 444, 86 S.Ct. at 1612. By necessary implication, custodial interrogation does not exist where the person questioned is not in custody because he is not even a suspect in the crime, *State v. Baskerville,* 616 S.W.2d 839, 843 (Mo.1981), *State v. Overstreet,* 551 S.W.2d 621, 628 (Mo. banc 1977), or, even assuming that he was a suspect, where he is not under arrest or otherwise restrained of his liberty. *Oregon v. Mathiason,* 429 U.S. 492, 493–96, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977). Both of these circumstances are absent in this case. The state's witnesses testified, and the trial court could reasonably have found, that deputies Jenkins and Thurman believed appellant's account of Dawson's absence, did not suspect him of any crime and invited him to the Sheriff's office only to provide them with details that would help in locating Dawson. See *State v. Overstreet, supra,* at 628. Moreover, regardless of the deputies' belief that appellant was not a suspect in any crime, it is clear that appellant was not deprived of his freedom by them in any significant way. Appellant's trip to the Sheriff's office was entirely a matter of his own volition, after he had been told that he could go to the office or stay home as he pleased. His brief and self-requested stay in a cell was not for incarceration purposes but to afford him privacy from persons who had been coming into the office inquiring about Clayton Dawson. There is every reasonable inference from this evidence that appellant could have left both the cell and the Sheriff's office at any time had he so desired.

In *Oregon v. Mathiason, supra,* the defendant, a parolee suspected in a burglary, was asked to come to a police office, where he was interviewed by an officer in a closed room and admitted committing the crime. In holding that the defendant's statement was admissible in the absence of *Miranda* warnings, the United States Supreme Court stated as follows:

"police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the require-

ment of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'. It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited" (Emphasis in original).

*Id.*, 429 U.S. at 495, 97 S.Ct. at 714.

Clearly the facts in this case are stronger than those in *Mathiason* in that appellant was not a criminal suspect prior to his statement, and was not in police custody inasmuch as he voluntarily accompanied the officers to Ava and of his own choice elected to be temporarily placed in a jail cell.

Appellant cites *Orozco v. Texas*, 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311 (1969), in which the defendant was under arrest and not free to leave at the time he was questioned. Appellant's argument under this point principally cites his own testimony at the suppression hearing to the effect that he was in custody at the time he entered the cell, which testimony was directly contradicted by the other witnesses. The difficulty with this argument is that the trial court was not required to believe appellant's version of events, and "the review in this court is directed at the adequacy of the evidence to support the trial court's findings." *State v. Olinghouse*, 605 S.W.2d 58, 66 (Mo. banc 1980); see also *State v. Higgins*, 592 S.W.2d 151, 158 (Mo. banc 1979). As such, if the trial court's ruling is supportable under any reasonable view of the evidence, it will not be disturbed on appeal. *State v. Flowers*, 592 S.W.2d 167, 170 (Mo. banc 1979); *State v. Alewine*, 474 S.W.2d 848, 852 (Mo.1971). Under the evidence as set out above, we find that the trial court committed no error in overruling appellant's Motion to Suppress statements.

In appellant's second point, he contends that because his initial statement to the law enforcement officers was in violation of the *Miranda* doctrine, all subsequent statements and all physical evidence discovered as a result of his confession must also be suppressed. We find the original statement was admissible, therefore, this point is ruled against him.

■ In his third point, appellant complains that the trial court should not have permitted the state to endorse additional witnesses "on the day of trial." As has been repeatedly held, trial courts have a broad discretion in permitting the endorsement of the names of additional witnesses on the information or indictment. *State v. Strawther*, 476 S.W.2d 576, 579 (Mo.1972); see also *State v. Cameron*, 604 S.W.2d 653, 658 (Mo.App.1980).

■ A careful examination of the record discloses that the endorsements were not made "on the day of trial." Of the seven persons called as state's witnesses who were not listed on the original information, six were endorsed on the amended information filed more than three weeks before trial. Six days later, in response to appellant's untimely request for disclosure, the prosecution advised appellant when and where the written statements or memoranda regarding these witnesses could be examined. The seventh witness, Jon Miller, was disclosed to appellant four days before trial testimony was adduced (immediately after he was discovered by the prosecution), and appellant was given at least two opportunities to meet with and interview him. Miller was called as a witness for appellant in a motion hearing three days before he testified before the jury. In addition, his testimony was rather simple in nature in that it related to a statement made by appellant in jail two days after his arrest. Therefore, we find appellant was not prejudiced by the endorsement of these witnesses. *State v. Strawther, supra*, at 579–80; *State v. Lorenze*, 592 S.W.2d 523 (Mo.App.1979). We find no abuse of discretion by the trial court.

■ Finally, it is asserted that the evidence was insufficient to support the jury's conclusion that the murder was committed with premeditation and deliberation.[1] In reviewing this contention, the evidence is viewed in the light most favorable to the state, affording to the state all reasonable favorable inferences and ignoring all contrary evidence and inferences. *State v. Ludwig*, 609 S.W.2d 417, 418 (Mo.1980).

■ A complete review of the evidence discloses that the jury could reasonably conclude that the murder of Clayton Dawson was not the result of a sudden scuffle or argument between appellant and his "dad."

Appellant's statements that he would receive his uncle's money and property upon his death, which amounted to almost $80,000, the fact that appellant gave different reasons for Dawson's absence and two neighbors who had known Dawson and appellant for many years testified that they had never known of Dawson to strike appellant or spank him when he was small, was circumstantial evidence from which a jury could reasonably infer that the killing of Dawson was not as a result of a scuffle or argument between them.

Immediately after the murder and in the several days thereafter, appellant displayed both a presence of mind and a somewhat chilling nonchalance about events. In addition to loading his uncle's body, the victim's personal belongings and the ax used to kill him on Dawson's truck, the contents to be abandoned in an isolated area, he thought to take bales of hay to conceal the evidence. Having dumped and concealed the body, he took $120.00 from his "dad's" wallet, went into town and bought a dual exhaust system for the truck which had been Dawson's and was now his. The next day appellant returned to his "dad's" body, poured gasoline on it and burned it; he took Dawson's truck and engaged in various social activities with his friends, including a jaunt to Springfield and Branson, and a float trip, all with a complete air of indifference.

Two days after his arrest appellant was visited in jail by a school friend, Jon Miller. After telling Miller his version of the events, appellant was asked whether he was sorry for what he had done and replied, "if I had to do it all over again, I'd do the same thing."

From all of the above evidence, it was reasonable for the jury to infer that appellant's killing of Clayton Dawson was a planned, deliberated and premeditated act and not, as he claims, the product of an assault by the victim and a retaliatory response. *State v. Lieberknecht*, 608 S.W.2d 93, 95–99 (Mo.App.1980). The statement by appellant, that he would do it over again, when asked whether he was sorry for killing Dawson is sufficient evidence from which a reasonable juror could infer that defendant acted in a cool and deliberate state of mind with thought beforehand and thereby find deliberation and premeditation. *State v. Wood*, 596 S.W.2d 394, 401 (Mo. banc 1980). Accordingly, we find the jury's verdict of capital murder was clearly supported by the evidence and reasonable inferences therefrom.

Judgment affirmed.

MORGAN, P. J., BARDGETT and RENDLEN, JJ., and BARNES and SLOAN, Special Judges, concur.

---

1. Appellant also states that "the verdict is contrary to the weight of the evidence presented." This assertion raises no legitimate claim: " 'The weight of the evidence ... is not a matter reviewable by an appellate court' " (Citation omitted). *State v. Amerson*, 518 S.W.2d 29, 31 (Mo.1975); see also *State v. Eaton*, 504 S.W.2d 12, 16 (Mo.1973).