STATE of Missouri, Respondent,

v.

Bobby Lewis SHAW, Appellant.

No. 62679.

Supreme Court of Missouri,
En Banc.

Aug. 2, 1982.

Rehearing Denied Aug. 23, 1982.

Certiorari Denied Oct. 12, 1982.

See 103 S.Ct. 239.

---

William M. Barvick, Jefferson City, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

WELLIVER, Judge.

Appellant, an inmate at the Missouri State Penitentiary,[1] was convicted by a jury of capital murder, § 565.001, RSMo 1978,[2] for the stabbing death of Walter Farrow, a penitentiary corrections officer. The jury recommended the death penalty pursuant to § 565.008(1). This Court has exclusive appellate jurisdiction. Mo.Const. art. V, § 3. We affirm both the conviction and the sentence of death.

I

The facts are not in dispute.

On July 16, 1979, Officer Farrow was assigned to his usual position of supervisor of the twelve to fifteen inmates, including appellant, who worked in the vegetable preparation room at the penitentiary. At approximately 7:20 a. m., pursuant to normal procedure, he checked out two butcher knives and fifteen paring knives from the cold storage area where they were kept overnight. He took them to the vegetable room, where inmates used them to prepare fresh vegetables for the penitentiary kitchen. The knives were kept in a locked cabinet in the vegetable room and were checked out to inmates individually. At the time of the stabbing Farrow had unlocked the cabinet but had not yet issued knives to any of the inmates.

Inmate Roy Maggard, who was assigned to work in the vegetable room, testified that at about 7:30 a. m. he was drinking coffee and talking with Farrow and inmate Bruce Rogers. Maggard and Rogers were sitting on a sink countertop in the vegetable room eight to ten feet across from the knife cabinet and Farrow's desk. Maggard testified that he did not see or hear appellant approach. He said, however, that when he turned after hearing Farrow make a noise and say, "No, Shaw, no," he saw appellant, who was standing only inches away from the three-feet-high railing surrounding the desk, holding the two butcher knives that Maggard and Rogers usually used to cut cabbage. Maggard saw when Farrow rose from his chair that Farrow had been stabbed. Appellant ran out of the room, and Farrow, who was bleeding profusely, went to the door and ordered appellant to return.

Maggard and Rogers assisted Farrow back to a chair, and Maggard telephoned for assistance from other officers. Maggard then went down the hall approximately twenty-five to thirty feet to the state commissary in an effort to obtain assistance. There he saw inmates assisting Clinton Wyrick, the uncle of the warden and a civilian commissary employee, who also was bleeding from apparent stab wounds. Maggard said, "Oh, my God, no," and he returned to the vegetable room. Other officers arrived, and Farrow was taken to the penitentiary hospital, where he died because of blood loss about an hour after the stabbing. The stab wound was approximately seven inches deep. It penetrated the chest wall, went between the ribs, pierced the diaphragm and right lobe of the liver, and ended at the bottom of the liver. It severed the hepatic artery, which supplies blood to the liver, and as a result approximately three-quarters of Farrow's blood drained into the body cavity.

Inmate Byron Berry testified that earlier in the morning, as he was walking back to

1. Appellant currently is serving a life sentence for first degree murder imposed under the Second Offender Act, § 556.280, RSMo 1969. *See State v. Shaw*, 569 S.W.2d 375 (Mo.App. 1978).

2. All statutory references are to RSMo 1978 unless otherwise specified.

his job in the main kitchen after applying for a job on the loading dock behind the vegetable room, he saw appellant and another inmate standing alone outside one of the buildings. As he passed within two or three feet of them, he overheard the other inmate ask appellant, "When are you going to do that?" Appellant replied, "I'm going—might as well do it, now." Berry said that there was "something mentioned of a ring, a payment." He also said that he heard one of the men mention the name "Clint" and that he knew of only one person named Clint—Clinton Wyrick—inside the penitentiary.

Clinton Wyrick testified over appellant's objection that he was at his desk in the commissary that morning when appellant entered the open commissary doors. Appellant came around the low railing enclosing Wyrick's desk "in a kind of a little jog trot," took one step at the corner of Wyrick's desk, and, without saying a word, began to stab Wyrick with a butcher knife that he held in his left hand. He also tried to stab Wyrick with a butcher knife in his right hand. The stabbing actions were directed toward Wyrick's chest, but Wyrick was able to fend off the attack with his right arm, which was severely injured in the process. All the arteries and ligaments in his right arm were cut, and once the knife went completely through Wyrick's right arm. In addition, Wyrick was stabbed once in the chest, twice in the stomach, and once in the left arm. The attack lasted thirty to forty-five seconds before appellant ran out of the commissary.

Lt. James Wyrick, Clinton Wyrick's son and the warden's cousin, testified that he had just left the main dining room when he heard on his walkie talkie that there had been a stabbing in the commissary. He ran outside to "seal off the area." At that point he did not know whom appellant had stabbed. As he was attempting to lock Gate Nine, he saw appellant walking toward him. Appellant ordered Lt. Wyrick to let him by, and when Lt. Wyrick refused to do so, appellant pulled two butcher knives from the waistband of his pants and said, "I said, get out of the way." Lt. Wyrick

backed away, and appellant went through the gate. Appellant ran through another gate, across the lower prison yard, and into an upper area of the yard before appellant finally obeyed orders to stop. He dropped the knives and was taken into custody.

Appellant's evidence consisted solely of the testimony of Dr. Sadishur Parwatikar, a psychiatrist. Dr. Parwatikar testified that appellant has an I.Q. of 73, within the range of borderline mental retardation. He testified that persons of a low I.Q. are generally more susceptible to the suggestions of others than are persons with a higher I.Q. He testified on cross-examination by the state that suggestability does "not necessarily" interfere with the mental process and that he did not believe that appellant "could not make up his mind." He also testified on cross-examination that appellant would be able to form the intention to kill another person, that he would be able to know that he was practically certain to cause the death of another, and that he would be able to consider taking the life of another person and to reflect thereon coolly and carefully before doing so.

II

During voir dire the trial court recessed between questioning by the prosecutor and the defense counsel. The court admonished the veniremen not to discuss the case or receive outside input, but it did not read MAI–CR2d 1.08(a). Later, after the questioning by both sides was completed but before the jury was selected and sworn, the court allowed the veniremen to separate during a recess for lunch. Appellant now contends that the word "jurors" as used in § 546.230 and surrounding sections, specifically §§ 546.180 and 546.200–.220, actually means "veniremen" and that the trial court therefore erred (1) by failing to read MAI–CR2d 1.08(a) at the first recess and (2) by allowing the veniremen to separate for lunch.

Section 546.230 provides:

With the consent of the prosecuting attorney and the defendant, the court

may permit the *jury* to separate at any adjournment or recess of the court during the trial in all cases of felony, *except in capital cases*; and in misdemeanors the court may permit such separation of the jury on its own motion, but when the *jurors* are permitted to separate, *after being impaneled* as provided for in this chapter, and at each adjournment the court must admonish them that it is their duty not to converse among themselves, nor to suffer others to converse with them or in their hearing on any subject connected with the trial, or to form or express any opinion thereon, until the cause is finally submitted to them.

(Emphasis added.)

■ The trial court did not err by failing to read MAI–CR2d 1.08(a) to the venire panel at the first recess. That instruction is included within the section entitled "Oral Instructions to the Jury" and follows MAI–CR2d 1.06, "Instructions After Jury Is Sworn." The jury does not exist until the veniremen selected therefor are sworn to service in that capacity. *See* Black's Law Dictionary 768–69 (5th ed. 1979). It therefore is unnecessary to read MAI–CR2d 1.08(a) to the venire panel. *See State v. Bryant*, 558 S.W.2d 269, 269–70 (Mo.App. 1977). Moreover, it is clear that the trial court complied with the dictates of the statute.[3] The trial court adequately admonished the veniremen,[4] and there was no objection as to the sufficiency of the court's

instruction. *See State v. Brown*, 502 S.W.2d 295, 299 (Mo.1973). Substantial compliance with the statute is all that is required. *State v. Harris*, 477 S.W.2d 42, 46 (Mo.1972).

■ Neither was it error for the trial court to allow the veniremen to separate during the lunch recess. Section 546.230 proscribes only the separation of the *jury*, which at that point did not yet exist. *State v. Williams*, 515 S.W.2d 463, 466–67 (Mo. 1974).[5]

### III

Appellant next contends that the trial court erred in admitting evidence of the subsequent attack upon Clinton Wyrick. He argues that its admission was unconstitutionally inflammatory and that evidence of a crime committed after, rather than before, the crime with which a defendant is charged is not competent proof.

■ A criminal defendant has the right to be tried only for the crime or crimes with which he is charged. *State v. Wright*, 582 S.W.2d 275, 277 (Mo.banc 1979); *State v. Holbert*, 416 S.W.2d 129, 132 (Mo.1967). The admission of evidence of offenses unrelated to the cause on trial breaches that right because it may result in a conviction founded upon crimes of which the defendant is not accused. Thus, the long-established general rule is that proof of the

---

**3.** At least one court of appeals case has held that the admonishment provision of § 546.230 applies to only the jury and not the venire panel. *State v. Underwood*, 530 S.W.2d 261, 264–65 (Mo.App.1975). We are not required to make that determination in order to resolve this case.

**4.** The trial court instructed the jury as follows:
Let me also admonish you, ladies and gentlemen, you know very little about the case at this time, but you do have some general knowledge about it which has been related by [the prosecutor]. Of course, that is not evidence, it's merely to assist you in answering his questions intelligently. I don't want you to discuss the case even among yourselves at any time when the court is not in session. Certainly don't discuss it with anyone else, don't let anyone talk to you about the case. If anyone should try to do that,

simply remind them that you are a potential juror and I've told you not to discuss the case at all.

**5.** *Williams* held that the proscription against separation of the jury in capital cases did not become effective until the jury had been sworn. 515 S.W.2d at 467. Appellant argues that we should overrule *Williams* because at the time it was decided in 1974 Missouri's capital punishment law was unconstitutional. It is unnecessary to do so, however, because nothing in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), abrogates the holding in *Williams*. *Furman* struck down death penalty provisions that, because of the jury's unfocused sentencing discretion, created a substantial risk that the punishment would be inflicted in an arbitrary and capricious manner.

commission of separate and distinct crimes is inadmissible unless it has some legitimate tendency to establish that the defendant is guilty of the crime with which he is charged. *State v. Lasley*, 583 S.W.2d 511, 517 (Mo.banc 1979); *State v. Carter*, 475 S.W.2d 85, 88–89 (Mo.1972); *State v. Shilkett*, 356 Mo. 1081, 1086, 204 S.W.2d 920, 922–23 (1947); *State v. Harrold*, 38 Mo. 496, 497–98 (1866). Specifically, such evidence is admissible to prove the crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial. *State v. Reese*, 364 Mo. 1221, 1226, 274 S.W.2d 304, 307 (banc 1954).

■ The evidence of the assault upon Wyrick was admissible both to show motive and to prove the state's theory that the attacks upon Farrow and Wyrick were a part of a common scheme or plan intended to culminate in the injury or murder of Wyrick, the warden's uncle. In this case Wyrick's testimony about the attack was followed immediately by inmate Berry's testimony concerning the conversation he overheard between appellant and another inmate. The jury reasonably could have believed that appellant thought it necessary to eliminate Farrow in order to consummate his planned attack upon Wyrick and that the latter was his motive for so doing.

■ Appellant contends that the admission of evidence of the assault upon Wyrick was unconstitutional because it "was highly prejudicial and it was designed to inflame the passions of the jury" against him. He points to the language in *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980), that the determination of guilt, as well as the imposition of sentence, in a capital case must be made "on the basis of 'reason rather than caprice or emotion.'" While that statement as a fundamental matter of due process is but a truism, it would be foreign to our concept of criminal jurisprudence to suggest that

relevant evidence should be inadmissible merely because it tends to prejudice the defendant. *See State v. Wood*, 596 S.W.2d 394, 403 (Mo. banc), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980). Any incriminating evidence is by definition prejudicial. Relevance is the touchstone of due process, and beyond that the decision whether potentially prejudicial or inflammatory evidence should be admitted lies within the sound discretion of the trial court, *id.*, which is in a better position to balance the probative value and danger of the evidence. We cannot say that the trial court abused that discretion.

■ Appellant argues that evidence of a crime committed after, rather than before, the crime with which a defendant is charged is not competent proof. This Court, however, upheld admission of subsequent crimes tending to prove a common scheme or plan in *State v. Gillespie*, 336 S.W.2d 677 (Mo.1960), noting that "[t]he law need not be so technical or blinded to reality as to ignore a major part of such an infamous scheme." *Id.* at 683. *See State v. Hindman*, 543 S.W.2d 278 (Mo.App.1976). *See also People v. Houston*, 219 Cal.App.2d 187, 33 Cal.Rptr. 26 (1963). The cases appellant cites in support of his argument, *State v. Wood*, 613 S.W.2d 898 (Mo.App. 1981); *State v. Howard*, 601 S.W.2d 308 (Mo.App.1980); *State v. Buford*, 582 S.W.2d 298 (Mo.App.1979), are inapposite because in none of those cases, which involved the improper joinder of charges, was there evidence of a common scheme or plan. *State v. Wood*, 613 S.W.2d at 902; *State v. Howard*, 601 S.W.2d at 309; *State v. Buford*, 582 S.W.2d at 302. Evidence of the attack upon Clinton Wyrick was both competent and relevant. There was no error in admitting the testimony.

### IV

Appellant argues that the trial court erred in failing to instruct the jury on diminished mental capacity during the guilt phase of the trial because, he claims, the testimony of Dr. Parwatikar that appellant has an I.Q. of 73 and thus is borderline

mentally retarded constitutes evidence that appellant had diminished mental capacity at the time of the offense. He also argues that diminished mental capacity should have been submitted to the jury during the sentencing phase as a mitigating circumstance.

Under the doctrine of diminished mental capacity, unlike under the doctrine of not guilty by reason of a mental disease or defect excluding responsibility, a defendant remains fully responsible for his conduct but can be found guilty of only those offenses, if any, of which he is mentally capable. *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974). Diminished mental capacity is a special negative defense. MAI–CR2d 3.47 n.6. A special negative defense is one

> (1) upon which defendant does not carry the burden of proof . . . , (2) supported by enough evidence arising during the whole case to raise a reasonable doubt of defendant's guilt, and (3) presenting a positive fact or set of circumstances, as distinguished from a bare denial or converse, which, if found would negate one or more essential elements of an offense . . . or which, if found, would constitute a legal defense.

MAI–CR2d 2.04 n.2.

█ The evidence in this case would not support an instruction on diminished mental capacity. Dr. Parwatikar's uncontradicted testimony upon cross-examination by the prosecutor established that appellant would be able to form the intention to kill another person, that he would be able to know that he was practically certain to cause the death of another, and that he would be able to consider taking the life of another person and to reflect thereon coolly and carefully before doing so. Those elements are prerequisites to the ability to commit capital murder. *See* MAI–CR2d 15.02. The trial court did not err in not instructing on diminished mental capacity during either the guilt or sentencing phase of the trial.

**6.** The italicized sentences are the ones of which appellant complains on appeal. We quote the prosecutor's comments at length in order to

## V

Appellant contends, finally, that certain statements made by the prosecutor during his closing argument in the sentencing phase of the trial require that the death penalty be vacated.

During his lengthy argument the prosecutor made the following statements: [6]

> [Prisoners are in the penitentiary] because they could not be allowed to live in the society that you and I live in. Their conduct being so bad, in this case a thief, then a robber, and a murderer, that he could not—normal society could not tolerate his existence and they had to remove him. Where do we have? Where is the only place that is available to remove him to? The society of the Missouri State Penitentiary. The maximum security correctional facility in the State of Missouri. And now he's back in society. Now, it's a different society, be no doubt about that. But he's here. He's here to try to make his way. And now what's happened? *He can't make it in this society.* He's murdered again. Now, this is not an inmate who was murdered by another inmate, this is not a vicious person, this is an innocent sixty-one-year-old man who just out of the clear, blue sky, doing nothing but just passing his morning time after fifteen years or so in the Division of Corrections, who is murdered. *This defendant can't be allowed to live in this society any longer.* He can't make it in ours, we already knew that, you know it, now. Now, he can't make it in this society.
>
> . . . [Y]ou can reasonably bet that every inmate in [the penitentiary] has—knows just where the gas chamber is. What does it mean to the inmates? What did it mean to Bobby Shaw as he ran from the scene of a murder, down a ramp as indicated on this photograph, right past where the gas chamber was located? I mean, he didn't hesitate. Is there any

demonstrate the context in which those statements were made.

indication that that meant anything to him? I mean, this was a planned out murder. Did this have any indication of a consideration? Well, I submit to you, you make your own judgment, but it didn't mean a thing to him, then. And, *unless you sentence him to death, it won't mean a thing to him,* now . . . .

. . . .

. . . I submit to you, and [the defense counsel] may well say to you, you've got to live with this for years. You can't save Walter Farrow, you can't bring him back to life. But you might save another corrections officer or deputy sheriff or police officer if you take a stand and you say, "There is a line and it's time for that line to be drawn." *A man murders once, it's a life sentence. He murders again, he's had his life sentence. Bobby Shaw deserves to be sentenced to death.* He has earned that right.

■ Appellant contends first that the prosecutor misstated the law. *State v. Bolder,* 635 S.W.2d 673 (Mo.banc 1982), was the first case in which we reviewed a death sentence imposed by a jury after it found as a statutory aggravating circumstance that the defendant was lawfully confined at the time of the murder. In *Bolder,* as in the present case, the appellant was serving a life sentence for first degree murder at the time he committed another murder within the confines of the Missouri State Penitentiary. We said in *Bolder* that "[t]he life sentence that appellant is already serving for first degree murder did not deter appellant from committing still another murder. The imposition of yet another life sentence would serve no purpose other than to signal that there is no real cost for prisoners who kill while in confinement." *Id.* at 683. We noted that "the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future" was one purpose underlying § 565.012(2)(9), which provides as a statutory aggravating circumstance that "[t]he capital murder was committed by a person in . . . the lawful custody of a . . . place of lawful confinement." *State v. Bolder,* 635

S.W.2d at 682. We concluded that the legislature, in adopting that statutory aggravating circumstance,

reasonably could have concluded that the death penalty is appropriate when imprisonment already imposed does not deter capital murder. The imposition of capital punishment is rationally related to the state's obviously legitimate interests in preventing crime and protecting other persons, *such as prison employees* and other inmates, with whom prisoners come in contact.

*Id.* at 683 (emphasis added). The prosecutor in this case did not misstate the law.

■ Appellant's second argument is that the prosecutor misled the jury "into believing that a life sentence actually means life without the possibility of parole" and that because prisoners under a life sentence generally will be paroled, the imposition of another life sentence, this time without possibility of parole for fifty years, would be an effective deterrent. A majority of the Court in *Bolder* rejected precisely the same argument posed by Judge Seiler in dissent. *See id.* at 691 (Seiler, J., dissenting). We noted that the United States Supreme Court "has suggested that an intentional killing by a prisoner serving a life sentence or convicted of an unrelated murder presents a unique problem that may justify *mandatory* imposition of the death penalty." *Id.* at 690 n.16. *See Roberts v. Louisiana,* 428 U.S. 325, 334 n.9, 96 S.Ct. 3001, 3006 n.9, 49 L.Ed.2d 974 (1976); *Gregg v. Georgia,* 428 U.S. 153, 186, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976). *See also Lockett v. Ohio,* 438 U.S. 586, 604 n.11, 98 S.Ct. 2954, 2964 n.11, 57 L.Ed.2d 973 (1978); *Roberts v. Louisiana,* 431 U.S. 633, 637 n.5, 97 S.Ct. 1993, 1995 n.5, 52 L.Ed.2d 637 (1977); *Woodson v. North Carolina,* 428 U.S. 280, 287 n.7, 292–93 n.25, 96 S.Ct. 2978, 2983 n.7, 2985–2986 n.25, 49 L.Ed.2d 944 (1976). The Supreme Court appended no qualification that the previous conviction be for *capital* murder or that the sentence already imposed require that the defendant serve a minimum amount of time, such as the fifty years required by Missouri's capital scheme,

before he could be considered for parole. We think it unnecessary to impose such a qualification here.

▮▮▮ Appellant next asserts that the prosecutor should be prevented from arguing that the jury should impose the death penalty on the basis of any aggravating circumstance—in this case, appellant's previous conviction for first degree murder—that is not specifically enumerated in § 565.012(2). This argument misconceives the rationale underlying the use of statutory aggravating circumstances. The jury does not impose the death sentence on the basis of the aggravating circumstance or circumstances that it finds in a particular case. Rather, "[t]he jury's finding that one or more statutory aggravating circumstances exist is the threshold requirement that must be met before the jury can, *after considering all the evidence*, recommend the death sentence." *State v. Bolder*, 635 S.W.2d at 683 (emphasis added). *See Gregg v. Georgia*, 428 U.S. at 197, 96 S.Ct. at 2936. The use of statutory aggravating circumstances helps prevent the arbitrary and capricious imposition of death sentences that the Supreme Court condemned in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because the jury's sentencing discretion "is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976). The jury thus cannot "reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime[.]" *Gregg v. Georgia*, 428 U.S. at 197, 96 S.Ct. at 2936. The statute clearly contemplates that the jury in deciding whether to impose the death penalty shall consider, in addition to the statutory aggravating circumstance or circumstances that it finds, "any ... aggravating circumstance otherwise authorized by law." § 565.012(1)(2). The imposition of punishment should rest upon a consideration of the evidence as a whole. It would be inconsistent with both the language and the purpose of the statute to impose upon the state the limitation that appellant now urges.

▮▮▮ Finally, appellant contends that the prosecutor's argument was intended to arouse the passions of the jury against him. The trial court has broad discretion in controlling the arguments of counsel, *State v. Lansford*, 594 S.W.2d 617, 622 (Mo.banc 1980), and absent an abuse of that discretion there is no reversible error, *State v. Wood*, 596 S.W.2d at 403. Appellant did not object to the prosecutor's argument at trial, and we cannot say that the trial court abused its discretion by not intervening on its own motion.

## VI

Section 565.014(1) mandates that we review the death sentence when it is imposed. Having found no error among appellant's assignments of error, we turn to a consideration of the punishment.

Section 565.014(3) provides:

With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

▮▮▮ Our review of the entire record convinces us that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found two aggravating circumstances present in this case. It found that the murder was committed against a corrections employee engaged in the performance of his official duty, § 565.012(2)(8), and that it was committed by a person in the lawful

custody of a place of lawful confinement, § 565.012(2)(9). There is no dispute in this case as to the correctness of the jury's findings. They are supported by the evidence.

Our final consideration is whether the death penalty, taking into account both the crime and the defendant, is excessive or disproportionate to the penalty imposed in similar cases. Since the enactment of our current capital murder statute, § 565.001, this Court has reviewed and affirmed three death sentences. *State v. Bolder*, 635 S.W.2d 673 (Mo.banc 1982); *State v. Newlon*, 627 S.W.2d 606 (Mo.banc 1982), *petition for cert. filed* (U.S. May 5, 1982) (No. 81–6660); *State v. Mercer*, 618 S.W.2d 1 (Mo.banc), *cert. denied*, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). We have reversed one death sentence because of its disproportionality. *State v. McIlvoy*, 629 S.W.2d 333 (Mo.banc 1982). In addition to *Bolder, Newlon*, and *Mercer*, we have affirmed twelve capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury. *State v. Greathouse*, 627 S.W.2d 592 (Mo.1982); *State v. Bostic*, 625 S.W.2d 128 (Mo.1981); *State v. Thomas*, 625 S.W.2d 115 (Mo.1981); *State v. Emerson*, 623 S.W.2d 252 (Mo.1981); *State v. Turner*, 623 S.W.2d 4 (Mo.banc 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Jensen*, 621 S.W.2d 263 (Mo.1981); *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981); *State v. Mitchell*, 611 S.W.2d 223 (Mo.banc 1981); *State v. Williams*, 611 S.W.2d 26 (Mo.banc 1981); *State v. Royal*, 610 S.W.2d 946 (Mo.banc 1981); *State v. Borden*, 605 S.W.2d 88 (Mo. banc 1980); *State v. Downs*, 593 S.W.2d 535 (Mo.1980).

We have decided only one case in which the statutory aggravating circumstance was that the murder was committed by a person in the lawful custody of a place of lawful confinement. We upheld the conviction and death sentence recently in *State v. Bolder*, which is strikingly similar to the present case. In *Bolder*, as here, appellant at the time of the killing was imprisoned in the Missouri State Penitentiary on a conviction for first degree murder. Bolder stabbed and killed another inmate. One pending case, *State v. Trimble*, No. 62523 (Mo. banc argued Sept. 15, 1981), involved the same aggravating circumstance, and in that case the jury imposed the death penalty.[7]

This is the first case we have reviewed in which the jury found as an aggravating circumstance that the murder was committed against a corrections employee engaged in the performance of his official duty. The addition of this circumstance, we believe, makes the imposition of the death penalty even more compelling in this case. The murder of on-the-job corrections employees cannot, and must not, be taken lightly if the stability of the penal system is to be maintained.[8]

This case is not, as appellant argues, similar to *State v. McIlvoy*, in which the death penalty was reversed because of its disproportionality. *McIlvoy* was peculiar because McIlvoy received the death penalty although his accomplice, who was the driving force behind the plot, did not. Moreover, a host of other factors, considered as a whole, demonstrated the inappropriateness of capital punishment. The circumstances surrounding this case fall far short of exhibit-

---

**7.** We consider this case only to determine what penalties juries have imposed in factually similar situations. *See State v. Bolder*, 635 S.W.2d at 684. In so doing we intimate no view as to its ultimate disposition.

**8.** We note that the jury imposed the death penalty in one of three analogous cases in which the aggravating circumstance was that the murder was of a police officer in the performance of his official duties. *State v. Baker*, No. 63244 (Mo. banc argued May 17, 1982).

*See* note 7 *supra*. In the two other such cases the jury imposed life imprisonment without the possibility of parole for fifty years, but in both there was evidence of mental disease or defect at the time of the murder, and there was evidence in both that the murder was committed while the defendant was under extreme mental or emotional disturbance. *State v. Thomas*, 625 S.W.2d 115 (Mo.1981); *State v. Davis*, No. 63475 (Mo. banc filed Oct. 16, 1981). Such is not the case here.

ing the same quality of mitigation. *McIlvoy*, as each case must be, was decided on its own facts, and it should not be given the broad reading urged by appellant.

Those imprisoned for violating our laws have cast upon the state both the expense of, and the responsibility for, their safe care while in confinement. We have always held the state to the highest standards in the exercise of that responsibility. Those for whom the state must bear responsibility should be held to an equally high standard of conduct. We are unaware of either sound reason or social policy for excusing the senseless killing of either fellow prisoners or corrections officers.

We conclude that the death penalty imposed in this case is neither excessive nor disproportionate to the punishment imposed in similar cases.[9]

The judgment is affirmed.

Date of execution set for September 16, 1982.

DONNELLY, C. J., and RENDLEN, MORGAN and HIGGINS, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in dissenting opinion of SEILER, J.

SEILER, Judge, dissenting.

I respectfully dissent. In my opinion the trial court erred in not instructing on diminished mental capacity, both during the guilt and sentencing phase of the trial.

Sections 552.030.3(1) and (2), RSMo Supp. 1981, provide as follows:

3. Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible

(1) To prove that the defendant did or did not have a state of mind which is an element of the offense; or

(2) For the purpose of determining whether or not the defendant, if found guilty of a capital offense, shall be sentenced to death or life imprisonment.

There was evidence in this case from a qualified medical expert that the defendant has an I.Q. of 73, that anything between 72 and 85 is considered to be borderline mentally retarded;[1] that his verbal I.Q. was around 75 which would put him in the lower 8th percentile of the population; that his performance I.Q. was 69 which would put him in the bottom 2% of the general population; that a person with a lower I.Q. is more susceptible to suggestion and temptation and that this particular defendant should be considered borderline mentally defective.

The principal opinion points out there was also evidence in this case that nonetheless it would be possible for defendant to form the intent to kill another person, to know that he was practically certain to cause the death, and to consider doing so and reflect thereon coolly and carefully. It does not follow, however, that defendant's mental defect did not, in this particular case, operate so that he did not reflect coolly and carefully before doing what he did. There is evidence in the case that defendant and another inmate were talking just a few moments before defendant went into action and that the other inmate asked defendant, "When are you going to do that?", to which defendant replied "Might as well do it now" and that there also was something said about a ring and a payment, following which defendant virtually ran amuck.

It is not only a question of whether there is sufficient evidence to support a submission of capital murder. It is also a question of whether there was evidence sufficient for the jury to find that defendant's mental

---

9. The "viciousness" and "extremes" of this case have previously been recognized. *See State v. Bolder*, 635 S.W.2d at 691 (Seiler, J., dissenting).

1. The American Association on Mental Deficiency defines mental retardation as follows:

Mental retardation refers to subaverage intellectual functioning which originates during the development period and is associated with impairment in adaptive behavior. R. Edgerton, The Cloak of Competence 3 (1967).

capacity or lack of it was such that he did not, in fact, on this occasion, coolly and deliberately reflect and consider upon the matter, both with respect to the acts performed or as bearing upon whether he should have the death penalty. *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974). Being a borderline mental defective goes to the existence of the state of mind which makes up the elements of capital murder, and inasmuch as capital murder is the only crime for which death can be the punishment, it also goes to whether this particular defendant deserves the death penalty. "[I]t is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense." *Roberts v. Louisiana*, 431 U.S. 633, 637, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637 (1977).

The report required of the trial judge by § 565.014.1, RSMo 1978, on the questionnaire prepared by this court has a space to "List any non-statutory mitigating circumstances indicated by the evidence, if any" to which the trial judge answered "low mentality." Why was it not, therefore, instructed upon?

The Missouri death penalty statute requires a high degree of specificity as to aggravating circumstances instructions, so that the jury's attention is channeled in that direction. No such specificity is required, however, as to non-statutory mitigating circumstances. The only mention in the instructions in this regard was the general statement contained in instruction No. 19 to the effect the jury could consider all the evidence relating to the murder and "any circumstances which you find from the evidence in extenuation or mitigation of punishment." This is vague. The jury

should be allowed to examine this particular individual with at least the same degree of specificity as to extenuating or mitigating circumstances as it does with respect to aggravating circumstances.

It was for the jury to decide whether defendant's mental defect raised a reasonable doubt as to whether or not he acted with required mental intent. The jury should have considered this both at the guilt phase and at the punishment phase, but in the absence of MAI–CR2d 3.74 being given in the guilt phase and the absence of any mention of mental defect in the sentencing stage in the instructions, the jury's attention was deflected elsewhere. The practical effect was to minimize the jury's consideration of relevant mitigating factors, contrary to the requirements of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

A person who is a borderline mental defective is by definition a person of limited intelligence. The principal opinion distinguishes this defendant from the defendant in *State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982), where the death penalty was reduced to a life sentence without parole for 50 years. There, too, the defendant, among other things, was of "limited intelligence" (I.Q. of 81), "a weakling and follower." *Id.* at 341.[2] Similar considerations are present here. A person with an I.Q. of 73 is not on the same level with a person of normal intelligence. The matter of defendant's admitted subnormal intelligence should have been a factor which the jury was called upon to consider, just as a young age is something which the jury would be called upon to consider, even though a sixteen year old youth (if that were the defendant's age) would be capable of forming

**2.** Considering the crime, *see* § 565.014.3(3), other facts for comparison of *McIlvoy* with this case as to disproportionateness of the death penalty are that McIlvoy and others first tried to ambush the victim on the evening of February 2, 1979, but could not get close enough, so a second effort was made the following night. This time the victim's truck was stopped. According to the trial judge's report in the McIlvoy case (see § 565.014, *supra* ), McIlvoy ap- proached within a few feet of the victim and shot him twice in the head at point blank range. The gun jammed. McIlvoy unjammed it and put two more shots into the victim's head. The gun again jammed. McIlvoy again unjammed it and got off two more shots. The victim was hit in the head five times. For this McIlvoy was to have been paid $1,000 by the victim's wife.

the necessary intent for capital murder. Defendant's mental capabilities should be taken into consideration for the jury to resolve one way or the other as to its effect on guilt or punishment, but that was not done here.